(C.D. 2093)

BUHLER BROS., INC.
GEHRIG HOBAN & CO., INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 10, 1959)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.
*George Cochran Doub,* Assistant Attorney General (*Henry J. O'Neill* and *Richard H. Welsh,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Plaintiffs herein protest the classification and assessment with duty of an importation from Switzerland consisting of one motor variator.

The importation was classified by the collector of customs as a device suitable for controlling the speed of arbors, drums, disks, or similar uses, within the purview of paragraph 368 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 368), and duty was assessed thereon at the compound rate of $4.50 each, plus 65 per centum ad valorem.

The claim relied upon by plaintiffs is that the motor variator in issue should properly have been classified as a part of an article having as an essential feature an electrical element or device in paragraph 353 of said act (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, for which duty at the rate of 13¾ per centum ad valorem is provided.

The pertinent provisions of the statute are here set forth:

Paragraph 368, *supra*:

* * * any mechanism, device, or instrument intended or suitable for * * * controlling the speed of arbors, drums, disks, or similar uses * * *:

    (1)   If valued at * * * more than $10 each, $4.50 each;

    (2)   any of the foregoing shall be subject to an additional duty of 65 per centum ad valorem;

Paragraph 353, as modified, *supra*:

Articles having as an essential feature an electrical element or device * * *:
    Batteries * * *

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other * * * _____ 13¾% ad val.

Parts, finished or unfinished, wholly or in chief value of metal, not specially provided for, of articles provided for in any item 353 of this Part * * *    The same rate of duty as the articles of which they are parts.

Alternative claims made by plaintiffs that the imported article is dutiable as a machine or a part of a machine, not specially provided for, in paragraph 372 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 372), as modified by the Torquay protocol, *supra*, and dutiable at 13¾ per centum ad valorem, or as an article suitable for modifying or controlling electrical energy in paragraph 353, *supra*, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and dutiable at 15 per centum ad valorem, although not abandoned, have not been pressed.

Three illustrative exhibits were offered on behalf of plaintiffs and were received in evidence by the court. Exhibit 1 consists of a pamphlet describing the type TPJ continuous paste goods press with which the imported article is used. Exhibit 2 illustrates a motor variator and its method of attachment to a TPJ press. Exhibit 3 is a penciled cross-section diagram of a variator.

Rudolf Walter Schenk appeared as a witness on behalf of plaintiffs. He testified that, for approximately 15 years, he has been employed by Buhler Brothers, the actual importer herein, in an engineering capacity. He possesses a degree in engineering from Switzerland. Buhler Brothers are importers of food processing machinery. Schenk testified that his work requires him to be familiar with the technical aspects of the machinery imported by his company and that he supervises its installation.

It was Schenk's testimony that the imported motor variator is used with a paste goods press, also referred to as a macaroni machine, of a type designated as TPJ; that the motor variator is not used with any other article; and that the TPJ paste goods press is the first machine used in processing macaroni products. The witness described the operation of the paste goods press as follows: Semolina and water are mixed together in the press mixer and subjected to 10 or 12 minutes of constant mixing. The mixture is then fed into a small feeding trough under which there is an extrusion worm. Before entering the extrusion worm, the mixture consists of small balls which are formed by the semolina absorbing the water. The balls vary in size from one-eighth to three-eighths of an inch in diameter. The balls go from the feeding trough to the extrusion worm, and, at the end of the extrusion worm, there is a die which has many holes. The extrusion worm presses the macaroni dough through the holes in the die, and then the extruded pieces of dough are cut off to the desired size.

Schenk further testified that the paste goods press has electrical wiring, push buttons, a starter, and eight motors, which are permanently affixed, and that there is no other efficient means of operating this machine. The paste goods press weighs about 8 tons and is about 10 feet long, 8 feet high, and 8 feet wide. The motor variator weighs about 319 pounds and is approximately 4 feet long, 3 feet high, and 3 feet wide.

The witness stated that the function of the motor variator is to drive the vacuum feed worm, which is the connection between the large mixing trough and the feeding trough, on the paste goods press. The vacuum feed worm transfers the mixture from the large mixing trough into the feeding trough. The vacuum removes air from the mixture so as to obtain a denser product, which is of better quality and more desirable.

Schenk stated that the paste goods press is used primarily in the production of macaroni, but that it can be used for processing dough made from corn sirup or starch. The imported motor variator is essential to the TPJ paste goods press when a vacuum system is applied. The motor and variator are parts of one unit and are built together, and were imported in this condition.

Witness Schenk's description of its functioning is paraphrased as follows: The motor variator consists of a motor with a constant speed output shaft. This output shaft is connected to the input shaft of the variator and there is an input cone connected to the variator's input shaft. Two transfer disks connect the input cone with the output cone of the variator, and the output cone is connected to the output shaft of said variator. The output shaft turns the vacuum feed worm through two pulleys and a worm gear reducer. The two transfer disks are driven by the input cone by means of friction and the transfer disks themselves drive the output cone because of friction. When the two transfer disks are adjusted by means of a hand wheel, their pitch is changed, which, in turn, changes the speed of the output cone. The speed of the input cone is constant, but when the transfer disks are pitched by turning the hand wheel, the output cone increases or decreases in speed. Both the input and output cones are conical and have various diameters. The two transfer disks can be moved along the circumference of these diameters by manually adjusting the hand wheel. When the transfer disks change from one diameter to another, there is a change in speed because there is a change in circumference. The variator is manually operated and does not itself control the speed of the vacuum feed worm gear. The speed is controlled by the hand wheel which tips the disks, the variator transferring the power from the motor to the vacuum feed worm.

It was Schenk's testimony that the motor variator is essential to the operation of the paste goods press when said machine has a vacuum system. A paste goods press is made either with or without a vacuum system, but, if it has a vacuum system, it has to have a motor variator in order to operate. If the machine is equipped with a vacuum system, said system is always used and cannot be shut off during the operation of the press. The motor turns at 1,750 revolutions per minute and this speed remains constant. The variator is just a means of transmission and does not control a shaft or spindle of the press. The variator has a speed range of 300 to 2,000 revolutions per minute. The motor drives the variator which, in turn, drives the vacuum food worm.

It has been stipulated and agreed by the parties hereto that the involved motor variator is composed in chief value of metal.

It is contended by plaintiffs in their brief that the TPJ paste goods press is an article having as an essential feature an electrical element or device and that the motor variator in controversy is an essential part thereof.

The defendant has filed a notice in writing to the effect that, upon consideration of the record made and the brief filed by plaintiffs, it did not desire to file one.

In support of their contention that the imported motor variator is not a device suitable for controlling the speed of arbors, drums, or disks, or similar uses, within the purview of paragraph 368 of the Tariff Act of 1930, as classified by the collector of customs, inasmuch as said variator does not automatically control speed but must be manually adjusted, plaintiffs rely on the case of *National Biscuit Co.* v. *United States*, 34 Cust. Ct. 23, C.D. 1671, as a judicial precedent.

In the *National Biscuit* case, *supra*, this court held that certain "drives," which were so related to one another as to synchronize all of the parts of the machine to a desired speed, the result being accomplished by a wheel and a screw which were manually operated, were not devices for controlling speed in paragraph 368, *supra*. In the course of its decision, the court stated—

It is pointed out that since the function of the speed units of which the drives form a part is "to synchronize all the parts of the machine according to the desired speed," which is done by a screw and a wheel manually operated, it is not a "similar use" within the intendment of said paragraph 368, citing *United States* v. *Bacharach Industrial Instrument Co.*, 13 Ct. Cust. Appls. 262, T.D. 41203. In that case, the court expressed the opinion that paragraph 368 of the Tariff Act of 1922 was confined to devices which function automatically, such as meters, and devices to control the speed of certain specified articles, also to articles, like alarm clocks, which perform some function at a predetermined time. There is nothing contained in the terminology of paragraph 368 as reenacted in the Tariff Act of 1930 which would tend to vary the controlling effect of the decision in the *Bacharach* case, *supra*.

On the uncontradicted evidence before us, it is our view, and we so hold, that the drives in controversy which, when attached to a Vicars continuous cutting machine, by manual manipulation only, synchronize the movable parts of the machine to enable the mechanism to perform its intended function effectively, are not, for duty purposes, devices for controlling speed in said paragraph 368 (a) (1) (2), as classified by the collector. * * *

From the uncontradicted testimony of plaintiffs' witness, Schenk, it is clear that the control of speed performed by the motor variator in issue is acomplished by *manually* changing the pitch of the transfer disks. We, therefore, conclude, as in the *National Biscuit* case, *supra*, that the motor variator before the court is not a device for controlling speed within the intendment of paragraph 368, *supra*.

It is also apparent, from the record before us, that the TPJ paste goods press, having as essential features thereof eight motors, together with electrical wiring, push buttons, and a starter, which are permanently affixed to the press, is an article "having as an essential feature an electrical element or device" within the purview of paragraph 353 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra*.

It further appears that when a TPJ paste goods press is equipped with a vacuum system, a motor variator is an essential part thereof without which the paste goods press could not operate.

Upon the evidence presented, the court holds that the motor variator in issue is a part of an article having as an essential feature an electrical element or device, within the provision therefor in paragraph 353 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra*, for which duty at the rate of 13¾ per centum ad valorem is provided. That claim in the protest is, therefore, sustained. All other claims are overruled.

Judgment will be entered accordingly.