(C.D. 2365)

PAILLARD PRODUCTS, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 17, 1962)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiff.
*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Henry J. O'Neill* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Certain so-called synchronization apparatus was classified by the collector of customs as instruments suitable for controlling the speed of arbors, disks, or similar uses in paragraph 368(a) of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 368(a)), as modified by the trade agreement with Switzerland, 90 Treas. Dec. 174, T.D. 53832, and duty was assessed thereon at the rate of $2.25 each and 35 per centum ad valorem.

It is the contention of plaintiff that said devices should properly have been classified as articles having as an essential feature an electrical element or device in paragraph 353 of said act (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, for which duty at the rate of 13¾ per centum ad valorem is provided.

For ready reference, the provisions of the statutes referred to are set forth below.

Paragraph 368(a) of the Tariff Act of 1930, as modified, *supra:*

Clockwork mechanisms, and any mechanism, device, or instrument intended or suitable for measuring distance, speed, or fares, or the flowage of water, gas, or electricity, or similar uses, or for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses, or for recording time, or for recording, indicating, or performing any operation or function at a predetermined time or times, * * * all the foregoing, whether or not in cases, containers, or housings:

    Mechanisms, devices, or instruments intended or suitable for measuring the flowage of electricity, valued over $15 each. * * *

   \*     \*     \*     \*     \*     \*     \*

Other (except mechanisms, devices, or instruments intended or suitable for measuring the flowage of electricity, and except time switches), valued each—

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|
| Over $10 | | | | | | $2.25 each and 35% ad val. |
| * | * | * | * | * | * | * |

Paragraph 353 of said act, as modified, *supra:*

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:
Batteries * * *

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|
| Other * * * | | | | | | 13¾% ad val. |
| * | * | * | * | * | * | * |

When this case was called for hearing, the parties stipulated and agreed that the merchandise in issue is composed in chief value of metal. Plaintiff presented the testimony of one witness and several exhibits were offered and received in evidence by both parties litigant, reference to which will be made, *infra.*

Plaintiff's witness, Kurt W. Wulliman, testified that he is employed with the plaintiff company as manager of the service and technical division, his duties involving supervising the maintenance and repair of all products distributed by his company throughout the United States, said products consisting of movie cameras and projectors and accessory articles.

An article received in evidence as plaintiff's exhibit 1 was identified by Wulliman as being identical with the instant merchandise with the possible exception of the color of the case. The terms "synchronization apparatus" and "synchromat" are used synonymously in the trade to describe the devices in issue.

The witness testified that the basic function of a synchromat is to synchronize the image being projected from a moving-picture film with the sound of a tape coming from a tape recorder.

Plaintiff's illustrative exhibit 2 was stated by Wulliman to correctly represent the function of a synchromat when it is connected with a tape recorder and a movie projector. Inside the basic unit of a synchromat is a rheostat, which is an electrical feature essential to the operation of a synchromat. The witness described a rheostat as an electrical device which permits a reduction of the voltage flowing through it and thereby reducing the power of any unit which is driven by it.

When asked to describe how a synchromat operates, Wulliman stated that a tape recorder is placed on a table, to the right of which a synchromat is placed. Above the tape recorder on another table is a silent movie projector. The tape recorder and the projector are both connected to regular electrical outlets in order to drive each item. The synchromat is not connected to an electrical outlet. The tape passing through the tape recorder, before being wound on the takeup roll, goes through the synchromat, and various pulleys, and then returns to the takeup roll. The movie projector is mechanically connected with the synchromat by a flexible cable, and the synchromat is also electrically connected with the projector. These two connections are necessary because the projector running on an alternating current will vary in speed due to the current alternation. When this variation is transmitted through the mechanical connection to the synchromat, the rheostat in the synchromat will transmit this fluctuation to the projector, which also has a rheostat, and increase or decrease the speed in order that the tape and the film remain in synchronization.

In order to place in operation the tape recorder, synchromat, and movie projector, after they have been set up as above described, it is necessary to adjust the speed of the projector manually in accordance with a reading taken from the synchromat. There is a mobile arrow on a movable pulley of the synchromat and a fixed arrow on the base plate of the device. These two arrows have to be matched and, in order to do so, it is necessary to change manually the speed of the projector. The speed at which the tape recorder moves remains constant.

An illustration on the back of the cover page of a pamphlet representing an article like plaintiff's exhibit 1, used in conjunction with a projector and a tape recorder, was received in evidence as defendant's exhibit A. A printed sheet identified as Bolex Technical Bulletin No. 11, prepared and distributed by Paillard, Inc., in connection with plaintiff's exhibit 1, representative of the merchandise in issue, was received in evidence as defendant's exhibit B. After being referred to the following sentence appearing in defendant's exhibit B—

'One of these rollers is mechanically connected with the rewind knob of the M-8 projector by means of a flexible cable supplied with the Synchromat. * * *

the witness, at the request of Government counsel, identified the guide roller referred to by drawing a circle at the appropriate part of the illustration in evidence as defendant's exhibit A. The witness stated that, in addition to the guide roller thus identified, there are four other guide rollers which he identified on said exhibit with the letters A, B, C, and D. He stated the function of these guide rollers was to guide the tape through the synchromat without damaging the tape—that

since the tape has to go from left to right and then from right to left, in order to make a proper curve without damaging the tape, it is necessary to have these rollers. One of these rollers which the witness referred to as the "mobile" roller is directly connected with the rheostat inside the synchromat which will put the projector back in synchronization, if the alternating current flowing to the projector should fluctuate while it is running.

The following statements contained in defendant's exhibit B were then read to witness Wulliman:

* * * This flexible cable transfers any fluctuation in the projection speed immediately and accurately to the guide roller and as soon as the speed of the roller does not exactly correspond to the speed of the tape recorder, the tape becomes tighter or slacker, which in turn moves another movable guide roller connected to the electrical circuit of the Bolex M–8 projector. Any change in speed therefore automatically readjusts the speed of the projector motor. * * *

The witness thereupon stated that, if the projector is manually set at the proper speed, any change due to current fluctuations will be automatically corrected in the manner contained in the above quotation. He added, however, that a synchromat is limited in its scope of automatic correction of current variation when the projector is not properly set.

Wulliman stated that a movie projector is capable of complete and full use for the purpose for which it was designed, namely, the projection of silent film, without the use of a synchromat, such as plaintiff's exhibit 1, and that the same is also true of a tape recorder. A synchromat has no use except in conjunction with a projector and a tape recorder, and it must be used with a particular projector which is the one illustrated in plaintiff's exhibit 2.

On the record as above outlined, it is for the court to determine whether the imported synchromats were properly classified by the collector of customs as instruments suitable for controlling the speed of arbors, disks, or similar uses in paragraph 368 (a) of the Tariff Act of 1930, as modified, *supra*, or should have been classified as articles having as an essential feature an electrical element or device in paragraph 353 of said act, as modified.

Reference has been made in the briefs of the parties hereto to the cases of *United States* v. *Bacharach Industrial Instrument Co.*, 13 Ct. Cust. Appls. 262, T.D. 41203; *National Biscuit Co.* v. *United States*, 34 Cust. Ct. 23, C.D. 1671; and *Buhler Bros., Inc.*, and *Gehrig Hoban & Co., Inc.* v. *United States*, 42 Cust. Ct. 239, C.D. 2093.

In the *Bacharach* case, *supra*, our appellate court gave consideration to the applicability of paragraph 368 of the Tariff Act of 1922 (the predecessor and for all particular purposes the prototype paragraph under which the instant merchandise was classified) to an importa-

tion of eight indicators for use in connection with steam and gas engines and electrically driven air compressors. In the course of its opinion, the court, in considering the following language newly added to paragraph 368 of the act of 1922—

> * * * and any device or mechanism having an essential operating feature intended for measuring time, distance, or fares, or the flowage of water, gas, electricity, or similar uses, or for regulating or controlling the speed of arbors, drums, disks, or similar uses, or for recording, indicating, or performing any operation or function at a predetermined time or times.

made the following observation:

> This language seems naturally to divide itself into three general classes of mechanical devices—first, devices such as meters for measuring the quantity of certain specified things; second, devices such as those controlling the rotation of phonograph disks, for the control of the speed of certain specified things; and, third, devices such as alarm clocks, to perform some function at a predetermined time.

The court then found that:

> The indicator in the case at bar, in our opinion, does not fall within any of these classes. It does not measure the quantity of anything; it does not regulate or control anything; it is true that it supplies data by which the operator may be better enabled to regulate his engine, but in itself it regulates or controls nothing; it does not perform any function at some time which has been determined in advance; it operates only when the operator turns a cock and admits pressure into its cylinder. It is, therefore, not a device which will automatically function at a certain appointed time, but will never function without manipulation.

In the *National Biscuit* case, *supra*, certain so-called "drives," which were essential parts of a Vicars continuous cutting machine used in the manufacture of dog biscuits, were held not to be devices for controlling speed within the purview of paragraph 368(a) (1) and (2) of the Tariff Act of 1930, for the reason that the drives there in issue would function to synchronize the movable parts of a Vicars continuous cutting machine only by manual manipulation. In arriving at its conclusion, this court relied on the *Bacharach* case, *supra*, and followed the interpretation there placed on the pertinent provision of the statute as applying to devices which function automatically rather than to those which depended for their performance on the manipulation of an operator.

This court held, in the *Buhler* case, *supra*, that a motor variator used with a paste goods press, also referred to as a macaroni machine, was not a device suitable for controlling the speed of arbors, drums, disks, or similar uses in paragraph 368 of the Tariff Act of 1930, for the reason that the control of speed performed by said variator was accomplished by manually changing the pitch of the transfer disks.

In the instant case, plaintiff's counsel argues that—

\* \* \* it has been demonstrated that the imported synchromat is not an automatic device and must be manually adjusted so that the speed at which the film is projected is coordinated with that of the sound tape.

On the record before us, we are not impressed with this argument. Whereas it has been shown by the testimony of plaintiff's witness, Wulliman, that prior to placing a combined movie projector, synchromat, and tape recorder in operation, it is necessary to adjust the speed of the projector manually in accordance with a reading taken from the synchromat, when said preparatory step has been taken and the three units are placed in motion, the synchromat automatically controls the operation of the movie projector and the tape recorder in synchronization. This latter fact is borne out by the following statements contained in defendant's exhibit B:

Tape recorder and projector are kept in accurate synchronization by means of the Synchromat which is small electro-mechanical device, which makes the speed at which the film is projected depend on the speed at which the tape is driven, that is, it continuously regulates the projection rate from beginning to end so that sound and film are permanently synchronized with each other. This is accomplished by letting the tape run over the guide rollers of the Synchromat before it is wound up on the take-up reel of the tape recorder.

One of these rollers is mechanically connected with the rewind knob of the M–8 projector by means of a flexible cable supplied with the Synchromat. This flexible cable transfers any fluctuation in the projection speed immediately and accurately to the guide roller and as soon as the speed of the roller does not exactly correspond to the speed of the tape recorder, the tape becomes tighter or slacker, which in turn moves another movable guide roller connected to the electrical circuit of the Bolex M–8 projector. Any change in speed therefore *automatically readjusts the speed of the projector motor.* \* \* \* All three units, projector, Synchromat, and tape recorder are started and stopped together simultaneously by simply switching the tape recorder's operating control on and off. It is therefore possible to stop the units during recording or playback without losing the synchronization, provided that the units are *not disconnected.* [Italics supplied.]

In harmony with the views expressed by our appellate court in the *Bacharach* case, *supra*, we are of the opinion, on the record here presented, that a synchromat, such as plaintiff's exhibit 1, in the performance of the function for which it was designed and is used to permit the sound from a tape recorder to be played simultaneously with the projection of a moving-picture film, automatically controls the speed of the projector motor in order to synchronize the recorder and projector and is such a device as is encompassed by the provision in paragraph 368(a) of the Tariff Act of 1930, as modified, *supra*, for instruments suitable for controlling the speed of arbors, drums, disks, or similar uses. We, therefore, affirm the action of the collector in so classifying the synchromats in issue and overrule the claim of plaintiff's protest.

Judgment will be entered accordingly.