(C.D. 2603)

## D.C. Andrews & Co., Inc. *v.* United States

United States Customs Court, Second Division

(Decided December 22, 1965)

*Wallace & Schwartz* (*Joseph Schwartz, Earl R. Lidstrom,* and *Barnes, Richardson & Colburn* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Bernard J. Babb* and *Charles P. Deem,* trial attorneys), for the defendant.

Before Rao and Ford, Judges

Ford, Judge: Imported from England were certain Carter hydraulic infinitely variable speed gears covered by the above-enumerated protest, which the collector of customs classified as mechanisms, devices, or instruments, intended or suitable for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses, in paragraph 368(a) of the Tariff Act of 1930, as modified by the trade agreement with Switzerland, 90 Treas. Dec. 174, T.D. 53832, and im-

posed duty thereon at the compound rate of $2.25 each and 35 per centum ad valorem.

It is plaintiff's contention that the devices in controversy should properly have been classified as machines, not specially provided for, within the purview of paragraph 372 of said tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and subjected to duty at the rate of 11½ per centum ad valorem.

The pertinent texts of the applicable statutes are as follows.

Paragraph 368(a) of the Tariff Act of 1930, as modified by the Swiss Trade Agreement, *supra*—

Clockwise mechanisms, and any mechanism, device, or instrument intended or suitable for measuring distance, speed, or fares, or the flowage of water, gas, or electricity, or similar uses, or for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses, or for recording time, or for recording, indicating, or performing any operation or function at a predetermined time or times, * * *; all the foregoing, whether or not in cases, containers, or housings:

Mechanisms, devices, or instruments intended or suitable for measuring the flowage of electricity * * *

Time switches * * *

Other (except mechanisms, devices, or instruments intended or suitable for measuring the flowage of electricity, and except time switches), * * *:

\*      \*      \*      \*      \*      \*      \*

    Over $10_____ $2.25 each and 35% ad val.

\*      \*      \*      \*      \*      \*      \*

Paragraph 372 of the Tariff Act of 1930, as modified by the sixth protocol, *supra*—

Machines, finished or unfinished, not specially provided for:

    Adding machines * * *

\*      \*      \*      \*      \*      \*      \*

    Other * * *_____ 11½% ad val.

Received in evidence was plaintiff's exhibit 1, a pamphlet containing an illustration of the speed gears in issue. The only witness called to testify was Theodore Staron, a gear engineer, and manager of the American division of the importer. He is in charge of selling the gears, and also of seeing to their proper application in any particular installation.

The testimony indicates that the working part of the gear is completely housed. The housing acts as an oil reservoir for the gear system as well as a container for the complete unit. From the exterior of the housing, both the input and output shafts are visible. The input shaft is always connected to some outside source of power, possibly

an electric motor. The gears are never used by themselves, that is, they are never used without some external primary mover.

Between the input shaft and the output shaft, the housing contains the working part of the gear. The output shaft is usually connected to some industrial machine, such as a conveyer. The function of the gear system is to vary the speed ratio between the outside source of power and the industrial machine.

The gear contains a makeup pump which draws oil by suction from the reservoir and delivers it to another unit of the gear, namely, the input pump. One revolution of the input shaft corresponds to one stroke of the makeup pump. The actual change in speed ratio is effected within the input pump, since it is the functioning of this component which varies the flow of oil. The input pump contains radially positioned pistons which are forced outward by the oil pressure. The pistons are forced against a thrust reaction ring, which surrounds the radial arrangement of pistons. The eccentricity of the reaction ring in relation to the geometric center of the radial arrangement of pistons is varied. The manually operated handwheel, located on the outside of the gear housing, controls a screw thread which produces lateral movement of the thrust reaction ring, and consequently varies its eccentricity. The length of the piston stroke is thereby altered, since the eccentricity of the thrust reaction ring will determine the allowable distance to be traveled by the displaced piston. The displaced piston strikes the reaction ring. As a result, the entire input pump rotates on ball bearings within the housing.

The length of the piston stroke determines the amount of oil that will be delivered to the output motor unit, another part of the gear. The output motor unit is similar to the input pump in design and operation. The output motor unit receives the flow of oil from the input pump and converts it to rotary motion which is then transmitted by means of the output shaft to an industrial machine. The entire motor unit also rotates on ball bearings within the gear housing.

The Carter gear, as imported, gives no indication of the rate of speed of the industrial machine attached to the output shaft. Once connected to the outside source of power and the industrial machine, the Carter gear contains everything necessary to effect a change in speed ratio between the input and output shafts. The Carter gear also contains everything necessary to vary the speed ratio between the prime mover and industrial machinery, with the exception of couplings of some sort, to join the gear shafts to the power source and machinery. Arbors, drums, and disks frequently are components of the industrial machinery attached to the Carter gear.

Having described the operation and use of the merchandise, as disclosed by the testimonial record, we now turn to a discussion of the relevant statutory provisions and case law.

Parties in their briefs make reference to the cases of *United States* v. *Bacharach Industrial Instrument Co.*, 13 Ct. Cust. Appls. 262, T.D. 41203, *National Biscuit Co.* v. *United States*, 34 Cust. Ct. 23, C.D. 1671, *Buhler Bros., Inc., and Gehrig Hoban & Co., Inc.* v. *United States*, 42 Cust. Ct. 239, C.D. 2093, and *Paillard Products, Inc.* v. *United States*, 49 Cust. Ct. 95, C.D. 2365.

The *Bacharach* case, *supra*, proves to be of particular importance in a determination of the present controversy. The merchandise there before the court consisted of eight indicators for use in determining the pressure in steam and gas engines and electrically driven air compressors. The devices had been classified by the collector of customs as measuring devices or mechanisms in paragraph 368 of the Tariff Act of 1922 (the predecessor paragraph to that invoked by the collector of customs in the instant case) and were claimed to be articles or wares, not specially provided for, within the basket provision of the metal schedule, paragraph 399 of the Tariff Act of 1922. In the course of its decision, which affirmed the trial court in sustaining the plaintiff's claim, the appellate court stated—

An inspection of paragraph 368 leads to the conclusion that this paragraph was intended to cover clocks and similar mechanisms. It is the successor to paragraph 161 of the tariff act of October 3, 1913, which related entirely to clocks, watches, and parts thereof. The Congress, however, in arranging said paragraph 368, inserted in this clock paragraph the following new language:

and any device or mechanism having an essential operating feature intended for measuring time, distance, or fares, or the flowage of water, gas, electricity, or similar uses, or for regulating or controlling the speed of arbors, drums, disks, or similar uses, or for recording, indicating, or performing any operation or function at a predetermined time or times.

This language seems naturally to divide itself into three general classes of mechanical devices—first, devices such as meters for measuring the quantity of certain specified things; second, devices such as those controlling the rotation of phonograph disks, for the control of the speed of certain specified things; and, third, devices such as alarm clocks, to perform some function at a predetermined time.

The indicator in the case at bar, in our opinion, does not fall within any of these classes. It does not measure the quantity of anything; it does not regulate or control anything; it is true that it supplies data by which the operator may be better enabled to regulate his engine, but in itself it regulates or controls nothing; it does not perform any function at some time which has been determined in advance; it operates only when the operator turns a cock and admits pressure into its cylinder. It is, therefore, not a device which will automatically function at a certain appointed time, but will never function without manipulation.

In the *National Biscuit* case, *supra*, this court held that certain drives, designated as back-apron drive, front-apron drive, sheeter drive, toproll drive, main drive, and cutter drive, used on a Vicars continuous cutting machine to cut dog biscuits, were not devices for controlling

speed within the purview of paragraph 368(a) of the Tariff Act of 1930. The drives there in issue did not function automatically but, by manual operation, only synchronized the movable parts of the machine to enable the mechanism to perform its intended function effectively.

The *Buhler* case, *supra*, involved a motor variator for use with a paste goods press or macaroni machine. Inasmuch as the record there disclosed that the motor variator did not *automatically* control speed, but had to be manually adjusted to function, the court came to the conclusion that such a mechanism was not a device suitable for controlling the speed of arbors, drums, disks, or similar uses, within the purview of paragraph 368 of the Tariff Act of 1930.

In the *Paillard* case, *supra*, this court sustained the collector of customs in his classification of certain synchronization apparatus as instruments suitable for controlling the speed of arbors, disks, or similar uses in paragraph 368(a) of the Tariff Act of 1930, as modified by the Swiss Trade Agreement (the specific provision being construed in the present case). From the testimony and other evidence of record in said *Paillard* case, the court was convinced that the synchromat there in issue, in the performance of the function for which it was designed and was used to permit the sound from a tape recorder to be played simultaneously with the projection of a motion-picture film, *automatically* controlled the speed of the projector motor in order to synchronize the recorder and the projector.

In the three last-cited cases, this court was influenced in its decisions by the *Bacharach* case, *supra*, and considered as encompassed by paragraph 368(a) of the Tariff Act of 1930, as modified, only those mechanisms, devices, or instruments which perform their function automatically. This was so particularly in view of the fact that, in reenacting paragraph 368 in the Tariff Act of 1930, Congress was alerted to the *Bacharach* decision. We quote the following from the Summary of Tariff Information, 1929, page 794—

DECISIONS

Paragraph 368, it has been held, was intended for the protection of manufacturers of clocks and clock-work mechanisms. It does not include instruments which do not automatically perform their function but depend for such performance upon the manipulation of the operator. Accordingly, *indicators for determining* the *pressure* in steam and gas engines or air compressors were held not to be within the paragraph and to be dutiable as manufactures of metal, paragraph 399. (13 Ct. Cust. Appls., 262.) [Italics quoted.]

It is to be noted from the record in the instant case that the Carter variable speed gears in controversy do not *automatically* perform their function. The speed of the gears is varied manually by an operator by cranking the handwheel which makes the output speed of the Carter gear go either faster or slower.

Broadly speaking, it might be said that the imported articles come within the literal language of paragraph 368(a) of the Tariff Act of 1930, as modified by the Swiss Trade Agreement, *supra*, as mechanisms, devices, or instruments, intended or suitable for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses. However, the Carter variable speed gears, as stated above, do not function automatically but must be hand operated. Therefore, we hold, following the cases above cited and the indication of congressional intent reflected by the Summary of Tariff Information, 1929, that the Carter variable speed gears in controversy are not, for customs duty purposes, encompassed by the provision of paragraph 368(a) of the Tariff Act of 1930, as modified, invoked by the collector of customs.

As to the sole claim relied upon by plaintiff herein, namely, that the imported articles should properly have been classified as machines, not specially provided for, in paragraph 372 of the Tariff Act of 1930, as modified by the sixth protocol, *supra*, we refer to the following statement, which appears in the brief of defendant—

At the outset, let it be said that the defendant has no quarrel with the plaintiff's contention that the imported variable speed gears are machines. Accordingly, if they are not more specifically provided for elsewhere, they are properly dutiable under paragraph 372, as claimed. * * *

The court is convinced by the evidence of record that a Carter variable speed gear, the function of which is to change the ratio between the speed of a motor and the machine to which the gear is connected, constitutes a machine in the tariff sense, and that said device is not elsewhere specially provided for in the tariff act. Accordingly, the court holds that the Carter hydraulic infinitely variable speed gears in issue should properly have been classified within the provision for machines, finished or unfinished, not specially provided for, in paragraph 372 of the Tariff Act of 1930, as modified by the sixth protocol, *supra*, and subjected to duty at the rate of 11½ per centum ad valorem. The claim in the protest to that effect is, therefore, sustained.

Judgment will be entered accordingly.